**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| INDIANA PUBLIC RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | Civil Action No.  3:25cv1056 |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| v. | |
| CARMAX, INC., WILLIAM NASH, ENRIQUE MAYOR-MORA, and JON DANIELS, | JURY TRIAL DEMANDED |
| Defendants. | |

## I.   **<u>INTRODUCTION</u>**

Plaintiff Indiana Public Retirement System ("Plaintiff"), individually and on behalf of all others similarly situated, by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (1) regulatory documents submitted by CarMax, Inc. ("CarMax", or the "Company") to the U.S. Securities and Exchange Commission ("SEC"); (2) press releases and media reports issued and disseminated by the Company; (3) analyst and media reports concerning the Company; and (4) other public information regarding the Company, including statements made by CarMax executives.  Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## II.   **<u>SUMMARY OF THE ACTION</u>**

1. This securities class action is brought on behalf of all persons or entities that purchased or otherwise acquired CarMax securities between June 20, 2025 and November 5, 2025, inclusive (the "Class Period").  The claims asserted herein are alleged against CarMax, William Nash, Enrique Mayor-Mora, and Jon Daniels (collectively, "Defendants") and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. CarMax is a used-car retailer that operates approximately 250 locations throughout the United States.  The Company maintains used-car inventory at its locations and, under relevant accounting standards, is required to accurately value used-car inventory and depreciate it whenever the expected selling price falls below cost due to oversupply, market conditions, or other factors that reduce resale value.

3.      CarMax provides financing to customers for their vehicle purchases through its operating segment, CarMax Auto Finance ("CAF"), and originates used-car loans for customers in accordance with underwriting standards established by management.   Under applicable accounting rules, CarMax must also establish a reserve for loan losses and periodically adjust this liability to reflect changes in customer credit risk and loan performance.

4.      In 2021, the Company held approximately 5 percent of the subprime loans extended to CarMax used-car purchasers.  Beginning in 2022, CarMax doubled its subprime loan target to 10 percent but reportedly tightened its credit standards in early 2023.  Since then, the Company has consistently highlighted its confidence in the adequacy of its loan loss reserves.

5.      Following the November 2024 election, President Donald Trump announced a series of steep tariffs expected to affect nearly all imported goods, including automobiles.  As a result, consumers rushed to purchase used vehicles in the first quarter of fiscal 2026[1] to avoid higher costs, creating a temporary surge in demand.  In response to this surge during March and April 2025, CarMax increased its inventory ahead of its second fiscal quarter, which ultimately led to an inventory oversupply once the tariff-induced urgency subsided.

6.      This complaint alleges that, throughout the Class Period, Defendants misled investors by failing to disclose that: (1) CarMax's 2022 and 2023 vintage loans were underperforming; (2) CarMax's loss reserves were inadequate to cover these loans; (3) CarMax had an oversupply of vehicles at its lots in early 2025; (4) this oversupply caused substantial depreciation of its inventory; (5) CarMax's mid-2025 sales boost was largely driven by customers rushing to purchase used cars amid concerns over potential new-car tariffs; and (6) based on the

---

[1] CarMax's fiscal year runs from March 1 to the end of February, with fiscal quarters ending on May 31, August 31, November 30, and February 28 or 29.  The first-quarter results for fiscal year 2026 correspond to the period ended May 31, 2025 and the second-quarter results for fiscal year 2026 correspond to the period ended August 31, 2025.

foregoing, Defendants materially overstated customer receivables, inventory values, and earnings, while misleading investors about the Company's business, operations, and growth prospects.

7.      For example, during the Class Period, the Company stated that "*[w]e continue to learn from our new underwriting models and corresponding tests* currently in place" and "*continue to monitor consumer behavior and the broader economy and will adjust our origination strategy as needed*."  The Company further stated that its loan loss reserve "*reflects our best estimate of expected future losses based on recent trends in delinquencies, loss performance, recovery rates and the economic environment*" and warned that "[l]osses in excess of the existing allowance for loan losses *could* have a material adverse effect on our business, results of operations and financial condition."  Defendants also characterized the pre-tariff sales boost at the end of the quarter as "*a reflection of a lot of the work that we've done internally, whether it's the inventory management, it's our pricing, it is our savings, it's the omnichannel experience, continuing to make that better*."  These and other similar statements caused CarMax securities to trade at artificially inflated prices during the Class Period.

8.      Unbeknownst to investors, the statements described above were false and misleading because, as CarMax Executive Vice President Jon Daniels later admitted, "we watched [2022 and 2023 vintage borrowers] begin to struggle and continue to struggle a little bit" and "we saw some of those customers coming back into delinquency and loss during Q1."  Furthermore, the positive financial results reported by the Company were driven by consumer speculation about tariffs, which motivated many to purchase cars, rather than reflecting CarMax's underlying business performance or its ability to deliver significant earnings growth. At the end of the Class Period, CarMax acknowledged that it had implemented measures to reduce inventory to correct

3

overstock and stated that, "[a]cross the back half of May, through the end of June, we saw about $1,000 in depreciation, which negatively impacted our price competitiveness and our sales."

9.      The truth emerged through two corrective disclosures.  First, on September 25, 2025, CarMax reported weak fiscal Q2 2026 results, citing tariff-related pull-forward of demand that left the Company with excess inventory and elevated depreciation expense as sales slowed beginning in May.  CarMax also disclosed a $142 million loan-loss provision, including $71 million related to 2022-2023 loans.  On this news, CarMax's stock price fell 20.1 percent.  Then, on November 4, 2025, CarMax disclosed that it had terminated the employment of CEO William Nash and warned of a sharp decline in used-car sales in the current quarter.  On this news, CarMax's stock price fell an additional 24.3 percent.

10.     As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of CarMax's securities, Plaintiff and the Class (defined herein) suffered significant losses and damages under the federal securities laws.

III.    **JURISDICTION AND VENUE**

11.     The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

12.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Defendant CarMax is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

14. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV. PARTIES

15. Plaintiff purchased CarMax securities during the Class Period, as indicated in the certification submitted herewith, and suffered damages as a result of the violations of federal securities laws alleged herein.

16. Defendant CarMax's principal executive offices are located in Richmond, Virginia. CarMax has multiple locations in this judicial district. The Company's common stock trades on the New York Stock Market (the "NYSE") under the ticker symbol "KMX."

17. Defendant William Nash ("Nash") served as the Company's Chief Executive Officer ("CEO"), President, and Director at all relevant times.

18. Defendant Enrique Mayor-Mora ("Mayor-Mora") served as the Company's Chief Financial Officer ("CFO") and Executive Vice President at all relevant times.

19. Defendant Jon Daniels ("Daniels") served as the Company's Senior Vice President, CarMax Auto Finance at all relevant times.

20. Defendants Nash, Mayor-Mora, and Daniels are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with CarMax, possessed the power and authority to control the contents of CarMax's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be

corrected.  Because of their positions and access to material non-public information available, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

21.    CarMax is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

22.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to CarMax under *respondeat superior* and agency principles.

## V.    **BACKGROUND**

23.    CarMax is a U.S.-based retailer that buys and sells used vehicles and provides financing to help customers purchase them.  CarMax generates revenue through two main segments: CarMax Sales Operations, which includes retail used vehicle sales, wholesale auctions, extended protection plans, and service operations; and CarMax Auto Finance (CAF), which provides financing for customer purchases.  In fiscal year 2025, CAF financed 43 percent of retail used car sales, and, as of February 28, 2025, CAF managed $17.59 billion in receivables across roughly 1.1 million accounts.

24.    CarMax operates approximately 250 stores across 109 U.S. television markets, covering roughly 85 percent of the U.S. population.  The Company has significant scale in vehicle transactions and financing: for the fiscal year 2025, CarMax retailed 789,050 units, sold 544,312 wholesale units, and purchased approximately 1.2 million vehicles from consumers and dealers. During the same period, CAF originated $8.3 billion in loans.

25.     Under relevant accounting standards, CarMax is required to properly value used-car inventory and to depreciate these assets when their value declines.  CarMax recognizes inventory write-downs by assessing the net realizable value, which represents the estimated amount the Company expects to receive from selling a vehicle after deducting all costs necessary to prepare it for sale and complete the transaction.  Any decline in value below cost is recorded directly as a component of cost of sales when market values fall.

26.     CarMax serves as a lender for prime borrowers and originates and retains a portion of the subprime loans.  In 2021, approximately 5% of the subprime loans were held on the Company's books.  Beginning in 2022, CarMax increased its subprime loan target to 10 percent while reporting tighter lending standards during 2023.  In April 2024, CarMax stated it had further tightened credit and reduced its loan-loss reserve to $483 million as of February 29, 2024.  In April 2025, Defendants again assured investors that credit tightening continued as CarMax reported a further reduction in reserves to $459 million as of February 28, 2025.

27.     In early 2025, proposed tariffs on imported goods, including automobiles, prompted consumers to rush vehicle purchases during CarMax's first fiscal quarter, creating a temporary surge in demand.  Analysts at JPMorgan noted this "demand pull-forward from F2Q into F1Q."  Following the surge, CarMax substantially increased its inventory ahead of the second fiscal quarter, resulting in an oversupply of used-car inventory on the Company's books once the tariff-induced urgency subsided.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

28.     The Class Period starts on June 20, 2025, when CarMax issued a press release entitled "CarMax Reports First Quarter Fiscal Year 2026 Results" (the "Q1 2026 Release").  In the Q1 2026 Release, Defendant Nash highlighted "***the strength of our earnings growth model***" as a "***key differentiator*** in a very large and fragmented market that positions us to continue to drive

7

sales, gain market share, and deliver *significant year-over-year earnings growth for years to come*."

29.    On the same day, CarMax held its earnings call for the first quarter of the 2026 fiscal year (the "Q1 2026 Call").  In introductory remarks during the Q1 2026 Call, Defendant Daniels made the following statement about the Company's loan loss provisions:

> CAF's loan loss provision of $102 million was impacted by several notable items.  First, Q1 is a seasonally higher sales and lower credit quality period, requiring a larger provision for newly originated volume.  Second, *loss performance within the quarter, particularly within 2022 and 2023 vintages, along with the uncertain economic outlook, necessitated additional loss reserves*.  Note the 2024 vintages remained largely in line with our original loss expectation.  The last noteworthy item impacting the Q1 provision relates to CAF's continued buildout of our full spectrum lending capabilities.  *While we remain focused on increasing our penetration across the credit spectrum, we also want to carefully manage future risk from higher profit, higher loss receivables*.

30.    During the question and answer portion of the Q1 2026 Call, Defendants Nash, Mayor-Mora, and an analyst had the following exchange about the pre-tariff sales boost:

> **Brian William Nagel, Oppenheimer & Co. Inc.**: Nice quarter, congratulations. . . . .  I guess the question I want to ask, we've seen a nice acceleration here in your used car business.  I know you don't typically talk much about intra-quarter trends or trends into the following quarter.  But . . . the question I want to ask is, I mean, how are you viewing the sustainability here?  As you're look at this, is the business coming back?  Is there anything unique to this reacceleration? . . .
>
> **Defendant Nash**: Sure[.] I'll take the first one, and then Enrique, . . . to talk about the expenses.  As far as acceleration, look, Brian, we feel really good.  I mean, first of all, just back up a second. We're really pleased that this is the fourth consecutive quarter of comp growth. Obviously, this quarter, we're pleased with the comps, especially all three months were positive.  As I think about the acceleration, and we talked a little bit about this last quarter, I think this month -- *this quarter's performance, it's driven some by the macro factors, but I also think it's driven some by with what we have - can control*.

And I would go back to some remarks I made in the last quarterly call, *which is the quarter started off strong and then we saw an uptick at the end of the quarter when there was speculation about the tariffs.  And then I talked about that uptick towards the latter part of March and then rolling into April, we saw another little uptick.  And so April ended up being the strongest month for us*.

*But I would just go back to - even before we saw that the initial uptick, the business was growing -- was doing well.  And I think that's a reflection of a lot of the work that we've done internally, whether it's the inventory management, it's our pricing, it is our savings, it's the omnichannel experience, continuing to make that better*.  So I think there's -- this performance is both part market driven.  I think it's also driven by us. So we feel great about the rest of the year.  As I said at the ending of the – at the end of last  year that we would expect to grow sales and gain share this year, and there's nothing that's changed that outlook.

31.    During the question and answer portion of the Q1 2026 Call, Defendants Nash, Daniels, and an analyst had the following exchange about off-balance sheet loans:

**Rajat Gupta, JPMorgan**: Sorry for the follow-up.  Just wanted to follow up on the new off-balance sheet approach.  And, is it fair to assume that a lot of the incremental penetration that you see in the CAF book from 42% to 50%, all of that will go through this off-balance sheet approach.  Basically trying to understand like what's the mix going to be or what you're targeting in terms of on-versus off-balance sheet for CAF.  Thanks.

**Defendant Daniels:** Yeah. Appreciate the question, Rajat, and a fair follow-up. So, I think one of the things we want to drive home here was we think this is a periodic play for us. Obviously, we have our higher prime deals.  We don't think it's necessarily set up for this approach, less volatility there, less risk in those customers. *In the non-prime approach, especially as we grow from 42% to 50%, which you've cited and I think it really does set itself up to – at some point in time, maybe we do want to retain that risk and all the additional cash flows that come with it because there is additional value there, where we're willing to offload some of that risk, take the cash up front*.  And again, maybe there's a little bit of a haircut there.  But I think it's an opportunistic play as we're going to see.  So, maybe it's once a year.  We'll see how it plays out.  But I wouldn't think about it as an all or nothing play here at all.

**Defendant Nash:** Yeah. I definitely wouldn't think about it that way.  If you look at the Tier 1 business, we aren't changing that.  I

mean that – we'll hold on that.  Think about it more being able to expand on some things that, like, hey, at the end of the day, probably I don't want to carry that.  And so to Jon's point, don't think about it as all in one bucket or the other. It's going to be a nice complement of the two.

**Defendant   Daniels:** Yeah. *There are definitely subprime receivables that we want to keep and hold for investment, and we'll continue to do that*.  Absolutely. And think of this play, and I mentioned it earlier, just kind of simplistically, it's going to enable our full spectrum and CAF income growth over time while mitigating some of that risk. So, we're really excited for this program. But, that's how I think about it.

32.     On June 26, 2025, CarMax filed its Q1 2026 Form 10-Q with the SEC (the "Q1 2026 10-Q"), reporting $200.3 million in net accounts receivable, $3.62 billion in inventory, and quarterly gross profit and net earnings of $893.6 million and $210.4 million, respectively.  The Q1 2026 10-Q incorporated risk factors disclosed in the Company's Form 10-K for the fiscal year ended February 28, 2025.  Such risk factors include the following:

**We may experience greater credit losses in CAF's portfolio of auto loans receivable than anticipated.**

We are exposed to the risk that our customers who finance their purchases through CAF will be unable or unwilling to repay their loans according to their terms and that the vehicle collateral securing the payment of their loans may not be sufficient to ensure full repayment.  *Credit losses are inherent in CAF's business and could have a material adverse effect on our results of operations*.

We make various assumptions and judgments about CAF's portfolio of auto loans receivable and provide an allowance for loan losses based on a number of factors.  Although management will establish an allowance for loan losses it believes is appropriate, this allowance *may* not be adequate. For example, when economic conditions deteriorate unexpectedly, additional loan losses not incorporated in the existing allowance for loan losses *may* occur.  Losses in excess of the existing allowance for loan losses *could* have a material adverse effect on our business, results of operations and financial condition.

10

33.    The Q1 2026 10-Q made the following statements about the valuation of CarMax's

inventory:

> As of May 31, 2025, **total inventory was $3.62 billion**, representing a decrease of $310.3 million compared with the balance as of the start of the fiscal year.  The decrease was primarily due to a decrease in volume driven by seasonality related to the end of tax refund season.

34.    The Q1 2026 10-Q made the following statements about CarMax's underwriting of

car loans:

> During fiscal 2025, CAF began testing its new full-spectrum credit scoring models and corresponding strategies across the Tier 1, Tier 2 and Tier 3 spaces.  During the first quarter of fiscal 2026, CAF began a measured expansion by recapturing profitable portions of Tier 1 originations that we had shifted to our Tier 2 lenders as we tightened lending standards.  We expect this expansion will grow our penetration by 100 to 150 basis points in the near-term, which is enabled by our non-prime securitization program, allowing us to efficiently fund these non-prime loans.  This is a first step on the path towards our initial goal of increasing CAF penetration to 50%.  **We continue to learn from our new underwriting models and corresponding tests currently in place** and anticipate capturing additional volume beyond Tier 1 during the back half of fiscal 2026.  **We will continue to monitor consumer behavior and the broader economy and will adjust our origination strategy as needed**.  We would expect each additional percentage point of CAF penetration to generate $10 million to $12 million in lifetime pre-tax income per year of origination, net of the impact to finance partner participation fees.  Our pre-tax income expectations will be impacted by the volume of loans originated, interest rates charged to customers, loan terms, loss rates, average credit scores, funding strategy, loan sales and the broader macroeconomic and lending environments.  We believe our unique finance platform with a full-spectrum in-house lending operation, coupled with a robust network of partner lenders, will strengthen our competitive advantage.

35.    The Q1 2026 10-Q made the following statements about the allowance for

CarMax's loan losses:

> The allowance for loan losses as of May 31, 2025 **reflects our best estimate of expected future losses based on recent trends in**

11

*delinquencies, loss performance, recovery rates and the economic environment*.

36.    The Q1 2026 10-Q was signed by Defendants Nash and Mayor-Mora and included Sarbanes-Oxley Act of 2002 certifications signed by both.

37.    The statements in ¶¶ 28-35 were false and/or misleading because at the same time these statements were made, Defendants misled investors by failing to disclose that: (1) CarMax's 2022 and 2023 vintage loans were underperforming; (2) CarMax's loss reserves were inadequate to cover these loans; (3) CarMax had an oversupply of vehicles at its lots in early 2025; (4) this oversupply caused substantial depreciation of its inventory; and (5) CarMax's mid-2025 sales boost was largely driven by customers rushing to purchase used cars amid concerns over potential new-car tariffs.  These statements caused CarMax securities to trade at artificially inflated prices during the Class Period.

## VII.    CORRECTIVE DISCLOSURES REVEALING DEFENDANTS' FRAUD

38.    The truth began to emerge on September 25, 2025, when CarMax reported Q2 2026 results.  Retail unit sales fell 5.4%, comparable store sales fell 6.3%, and wholesale units fell 2.2%. CarMax acknowledged intentional inventory reductions to correct overstock, noting that "[a]cross the back half of May, through the end of June, we saw about $1,000 in depreciation, which negatively impacted our price competitiveness and our sales."  The Company further admitted that it "saw an uptick in sales volume in March and April due to the tariff speculation."  Finally, CarMax disclosed a $142 million loan-loss provision, including $71 million for 2022-2023 loans.

39.    On this news, CarMax's stock price fell $11.45 per share, or 20.1 percent, to close at $45.60 per share on September 25, 2025.

40.    Then, in a Form 8-K filed with the SEC on November 6, 2025, the Company disclosed:

**On November 4, 2025, the Board of Directors of the Company (the "Board") terminated the employment of William D. Nash, the Company's President and Chief Executive Officer, effective December 1, 2025**, pursuant to and in accordance with Section 7.5 of Mr. Nash's Amended and Restated Severance Agreement with the Company, which was filed as Exhibit 10.2 to CarMax's Quarterly Report on Form 10-Q filed on January 5, 2024.

In connection with Mr. Nash's separation, Mr. Nash resigned from the Board, effective December 1, 2025. Mr. Nash's resignation was not the result of any disagreement related to any matter involving the Company's operations, policies or practices. In connection with Mr. Nash's resignation, the size of the Board will be reduced by one director such that the Board consists of nine directors, effective December 1, 2025.

41.     On the same day, CarMax issued a press release announcing expected results for its fiscal Q3 2026. The press release stated:

Fiscal Year 2026 Third Quarter Preliminary Outlook

CarMax today provided a preliminary financial outlook for the third fiscal quarter that ends November 30, 2025. Based on latest financial results, CarMax currently expects fiscal third-quarter results of:

- Comparable store used unit sales decrease of 8%-12%; and

- Net earnings per diluted share of $0.18-$0.36, including $0.09 of non-recurring expenses related primarily to the leadership change announced today and Customer Experience Center workforce reductions.

For the third quarter of fiscal year 2026, the Company's results have been impacted by several factors:

- A **decline in retail unit sales**;
- **Sharp depreciation in the wholesale business**; and
- Marketing spend, as noted in the second quarter earnings call, is expected to increase materially year-over-year in the third quarter as CarMax supports its new brand positioning launch.

Notwithstanding the above factors, the CarMax Auto Finance loan loss provision has been trending in-line with expectations set in the second quarter 2026.

42.     On this news, CarMax's stock price fell $9.93 per share, or 24.3 percent, to close at $30.88 per share on November 6, 2025.

13

43.    As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of CarMax's securities, Plaintiff and the rest of the Class (as defined below) have suffered significant losses and damages.

## VIII.    <u>ADDITIONAL SCIENTER ALLEGATIONS</u>

44.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the documents and public statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding CarMax, and their control over and/or receipt and/or modification of CarMax's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

45.    Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

46.    The Individual Defendants, because of their positions with CarMax, controlled the contents of CarMax's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had

14

not been disclosed to and were being concealed from the investing public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of CarMax's corporate statements and is, therefore responsible and liable for the representations contained therein.

## IX.    LOSS CAUSATION

47.    During the Class Period, as detailed herein, CarMax and the Individual Defendants made false and misleading statements and omissions, and engaged in a scheme to deceive the market. These false and misleading statements and omissions artificially inflated the price of CarMax securities and operated as a fraud or deceit on the Class (as defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, CarMax's securities price fell significantly. As a result of their purchases of CarMax securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## X.    CLASS ACTION ALLEGATIONS

48.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired CarMax securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, and directors and officers of CarMax and their families and affiliates.

49.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of September 24, 2025, CarMax had 146,845,043 shares of common stock outstanding, owned by hundreds or thousands of investors.

50.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants' statements and/or actions misrepresented material facts;

(c)     Whether Defendants' statements and/or actions omitted material necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements, actions, and/or omissions were false and misleading;

(e)     Whether Defendants' misconduct impacted the price of CarMax securities;

(f)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)     The extent of damages sustained by Class members and the appropriate measure of damages.

51.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

52.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

53.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

16

## XI.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

54.   CarMax's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

55.   Defendants are also liable for any false and misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false and misleading and the statement was authorized and/or approved by an executive officer of CarMax who knew that the statement was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present-tense statements when made.

## XII.   PRESUMPTION OF RELIANCE

56.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   the Company's securities traded in an efficient market;

(d)   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)   Plaintiff and other members of the Class purchased CarMax securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

17

57.    At all relevant times, the market for CarMax securities was efficient for the following reasons, among others:

(a)    as a regulated issuer, CarMax filed periodic public reports with the SEC;

(b)    CarMax regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)    CarMax was followed by numerous securities analysts employed by a major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)    CarMax stock was actively traded in an efficient market, the NYSE, under the ticker symbol "KMX."

58.    As a result of the foregoing, the market for CarMax securities promptly digested current information regarding CarMax from publicly available sources and reflected such information in the price of CarMax securities. Under these circumstances, all purchasers of CarMax securities during the Class Period suffered similar injury through their purchase of CarMax securities at artificially inflated prices and the presumption of reliance under the fraud-on-the-market doctrine applies.

59.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff and the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128, 153 (1972).

## XIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**(Against All Defendants)**

60.      Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

61.      During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

62.      Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)      Employed devices, schemes, and artifices to defraud;

(b)      Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of CarMax securities during the Class Period.

63.      Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CarMax securities.  Plaintiff and the Class would not have purchased CarMax securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

19

64.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of CarMax securities during the Class Period.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act**
**(<u>Against the Individual Defendants</u>)**

65.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1-59 as if fully set forth herein.

66.    The Individual Defendants acted as controlling persons of CarMax within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about CarMax, the Individual Defendants had the power and ability to control the actions of CarMax and its employees.  By reason of such conduct, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIV.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for judgment as follows:

(A)    Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

(B)    Awarding Plaintiff and the members of the Class damages with interest;

(C)    Awarding Plaintiff's reasonable costs, including attorneys' fees; and

(D)    Awarding such equitable, injunctive, or other relief as the Court may deem just and proper.

## XV.    <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated: December 23, 2025

Respectfully submitted,

*/s/ Steven J. Toll*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (Va. Bar No. 15300)
1100 New York Avenue, N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com

*Liaison Counsel for Plaintiff*

**LABATON KELLER SUCHAROW LLP**
Francis P. McConville (*pro hac vice* forthcoming)
Connor C. Boehme (*pro hac vice* forthcoming)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
fmcconville@labaton.com
cboehme@labaton.com

*Counsel for Plaintiff*

21